1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STALWART CAPITAL, LLC, a New Jersey
limited liability company,

                    Plaintiff,

    v.

ICAP PACIFIC NORTHWEST
OPPORTUNITY AND INCOME FUND, LLC,
A Delaware limited liability company, and
ICAPEQUITY REAL ESTATE FUND I, LLC,
an inactive Washington limited liability
company,

                    Defendants.

No.

COMPLAINT FOR BREACH OF
CONTRACT

      Plaintiff Stalwart Capital, LLC, by way of complaint against defendants iCap

Pacific Northwest Opportunity and Income Fund, LLC, and iCapEquity Real Estate Fund

I, LLC, alleges as follows:

      1.      Plaintiff Stalwart Capital, LLC, is a New Jersey limited liability company.

      2.      Defendant iCap Pacific Northwest Opportunity and Income Fund, LLC,

("New iCap Fund") is a Delaware limited liability company doing business in King

County, Washington.  Defendant iCapEquity Real Estate Fund I, LLC ("Old iCap Fund")

is an inactive Washington limited liability company that did business in King County,

COMPLAINT - 1

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1900    TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

53469\01000\00766002.DOC.V1 MTA

Washington. On information and belief, the same individuals or entities are members of both defendants.

3.     Venue is proper in this Court because defendants are, or were at the relevant times stated herein, doing business in King County, Washington.

4.     This Court has diversity jurisdiction under 28 USC 1332 because the amount in controversy is more than $75,000, and plaintiff and defendants are citizens of different states.

5.     Stalwart Capital is a broker/dealer in the business of consulting, assisting companies, serving as managing broker/dealer, and other roles in the business of locating investment funds for companies.

6.     As shown on the website www.icapequity.com, Mike and Chris Christensen individually and through LLC's run a group of companies commonly referred to as iCap Equity.  Together, they have formed at least twelve "iCap" entities, seven of which are still active limited liability companies.  The iCap entities are in the business of providing capital to real estate developers, as well as purchasing debt from lenders at discounted prices.

7.     In late 2012 and early 2013, Mike and Chris Christensen and Old iCap Fund desired assistance in raising capital for a real estate investment fund they owned, managed, or operated through iCap entities, affiliates, or subsidiaries.   They desired and required the services of a managing broker/dealer for Old iCap Fund to (i) provide consulting services including recommendations about the preparation and structuring of its security offering (the "Offering"), (ii) recommend and introduce the Company to third parties, including securities industry groups, due diligence analysts, broker/dealers, and others whom the managing Broker/Dealer thinks would be helpful to the Company in its efforts to raise capital (collectively a "Funding Source"), and (iii) serve as the managing

COMPLAINT - 2

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1900     TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

53469\01000\00766002.DOC.V1 MTA

broker/dealer, which includes preparing and maintaining all records required to be prepared or customarily prepared by managing broker/dealers after the marketing of the Offering begins, e.g., PPM delivery records, processing of subscription documents and subscription funds, etc.

8.      Pursuant to those ends, on or about January 18, 2013, Old iCap Fund and Stalwart Capital entered into a Best Efforts Placement Agent Agreement ("Placement Agreement").   A copy of the Placement Agreement is attached as Exhibit A.  Stalwart Capital agreed to use its best efforts to locate and introduce Old iCap Fund to Funding Sources that are willing to raise capital or provide financing or other funding to Old iCap Fund, to act as managing broker/dealer, and to advise Old iCap Fund on the structure of the Offering.

9.      Section 3 of the Placement Agreement sets out the compensation due to Stalwart Capital, identified in the Placement Agreement as "Agent" that would be paid by Old iCap Fund, identified therein as the "Company."  Section 3(b) and (c) provide:

> (b) If Agent locates Funding Sources and the Company and the Funding Sources close the transaction(s), then Agent shall receive a ten percent (10%) fee on all capital raised from the proceeds of each and every Closing.  Seven of these points will be the commission to be paid to any Selling Group Member responsible for the sale of the Company's securities; one percent (1%) will be for the due diligence fee that is reallowable to the Selling Group Member responsible for the sale; and two percent (2%) will be retained by Agent for its services as the Managing Broker.Dealer/Placement Agent.  In the event the Company, its management, affiliates, or representatives establishes any subsequent fund (whether now existing or yet to be created), and a Funding Source introduced to the Company by Agent subsequently invests in such fund, Agent shall be entitled to receive a 2% trailer fee at the time of investment; provided, however, that if the entity comprising such subsequent fund enters into a separate agreement with Agent for its services relative to such fund, then the provisions of such agreement shall control, and this trailer fee provision shall become null and void . Payments made under this Section 3(b) shall be made as of the date on which the funds are deposited into the Company's bank account
>
> (c) Agent shall also receive ten percent (10%) of all distributions of net income and capital gains (excluding tax distributions) available for

COMPLAINT - 3

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1900            TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

distribution by the Company, as permitted under the Company's LLC Agreement, subject to the following sentence (the "Profit Interest"). The Profit Interest shall be prorated according to the amount of funds raised by the Selling Group as compared to the total funds under management and shall be paid by the Company's management entity out of and the same as its Carried Interest. For example, if after paying the operating expenses of the Company there is $1.00 of Profit Interest available for distribution, and the Selling Group has raised 90% of the funds under management, then Agent shall receive nine cents ($0.09) (i.e. 90% of the ten cents ($0.10)) available for distribution. Agent may subsequently re-allow such payments fully or partially to other Selling Group Members as a means to encourage them to join the Selling Group and market the Company's securities.  Agent shall disclose to the Company the portion of the Profit Interest that has been offered and/or re-allowed to any Selling Group Member within 3-days of any request by the Company for such information

10.     Section 4 of the Placement Agreement prohibited Old iCap Fund from circumventing Stalwart Capital.  In section 4, Old iCap Fund agreed as follows:

The Company may not circumvent Agent with respect to any fee agreed to hereunder.   If Agent introduces the Company to any other Funding Source, directly or indirectly, by any means, and the Company obtains any capital by or through such other party, then Agent will be entitled to all compensation as detailed under Section 3 (b) and (c) above. By way of illustration, but without limiting the means of introduction that would entitle Agent to said compensation, if Agent recommends a broker/dealer conference, and the Company attends and meets or becomes aware of another broker/dealer that is a member of the group there that provides capital to the Company, then Agent will be entitled to the prompt payment of the compensation as detailed in Section 3(b) and 3(c) above.

11.     After executing the Placement Agreement, Doug Evans of Stalwart Capital recommended that Old iCap Fund's owners attend the TNDDA conference in Dallas, Texas.  The conference occurred in March 2013.   Mr. Evans attended the conference with Chris, Mike, and James Christensen, who are brothers.   Mr. Evans helped the brothers and Old iCap Fund prepare for the conference and present at the conference. The presentation was very well received.  Old iCap Fund presented at the conference under the name "iCap Pacific Northwest Real Estate Fund, LLC" a to-be-formed entity.

COMPLAINT - 4

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1900        TEL 206 292 1994
SEATTLE, WA 98104-4001  FAX 206 292 1995

subsequently moved to Skyway Advisors, and Chris Christensen and his brothers took their business with him.  By August 2013, iCap Pacific Northwest Income Fund, LLC, with help from Mr. Overby, put out a draft Offering Memorandum to raise $50,000,000.

16.    In November 2013, Chris Christensen formed iCap Pacific Northwest Opportunity and Income Fund, LLC, ("New iCap Fund").   On March 3, 2014, New iCap Fund filed a Form D with the SEC stating that its offering was for $30,000,000, and had raised $3.1 million to date.  Roger Overby's firm, Skyway Advisors, is listed in the Form D as the broker/dealer for the offering.

### CAUSE OF ACTION NO 1 – Breach of Contract

17.    Old iCap Fund breached the Placement Agreement by terminating Stalwart Capital, circumventing the Placement Agreement to contract with Roger Overby or his company, IAA, and failing to pay Stalwart Capital the amounts owed under the Placement Agreement.  Stalwart Capital recommended that Old iCap Fund attend a broker/dealer conference, and Old iCap Fund did attend and meet another broker/dealer, who it then hired to raise funds instead of Stalwart.  Thus, under section 4 of the Placement Agreement Old iCap Fund therefore owes the amounts stated in sections 3(b) and 3(c) of the Placement Agreement.

### CAUSE OF ACTION NO 2 – Breach of Contract Successor Liability

18.    New iCap Fund is liable for breach of the Placement Agreement because Chris Christensen, Old iCap Fund and Stalwart Capital had contemplated forming a new entity to complete the offering and that the new entity would be responsible for the obligations under the Placement Agreement.  Initially, the entity was going to be iCap Pacific Northwest Income Fund, LLC, the entity that presented at the TNDDA conference with Stalwart in Dallas, and which put out the Offering Memorandum with Mr. Overby.  As contemplated by the parties, the new entity that actually put out the

COMPLAINT - 6

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1900            TEL 206 292 1994
SEATTLE, WA 98104-4001  FAX 206 292 1995

offering and raised the money, which was New ICap Fund, is liable for obligations under the Placement Agreement.

19.     Alternatively, New iCap Fund is liable for the debts of Old iCap Fund because New iCap Fund merely represented a "new hat" for Old iCap Fund.  There is a common identity of members and managers between Old iCap Fund and New iCap Fund.  The same people, the Christensen brothers, ultimately control and own each entity.  The two entities are in the same business, and both were raising funds for the same purpose.  Because New iCap Fund merely represents a "new hat" for Old iCap Fund, New iCap Fund is a mere continuation of Old iCap Fund and is liable for Old iCap Fund's debts under the Placement Agreement.

20.     When New iCap Fund was created, there was a continuity of management, personnel, physical location, assets, and operations from Old iCap Fund to New iCap Fund.  There was also a continuity of members.  Old iCap Fund ceased to exist, or otherwise closed down is operations.   New iCap Fund assumed those obligations of Old iCap Fund necessary to continue the same line of business.  As such, New iCap Fund constitutes a de factor merger with Old iCap Fund and New iCap fund is liable for Old iCap Fund's debt under the Placement Agreement.

21.     Alternatively, New iCap Fund is liable for Old iCap Fund's debt under the Placement Agreement because the transfer of assets of Old iCap Fund to New iCap Fund (either directly or through iCap Pacific Northwest Income Fund, LLC) was a fraudulent transfer for insufficient consideration or for the purpose of escaping liability to Stalwart Capital.  On information and believe, no consideration was paid by New iCap Fund to Old iCap Fund for its assets, including its business expectations, offering memorandum(s), know-how, managers, and other intangible assets.

COMPLAINT - 7

Jameson Babbitt Stites & Lombard, p.l.l.c.
Attorneys at Law
801 Second Avenue
Suite 1900         Tel 206 292 1994
Seattle, WA 98104-4001 Fax 206 292 1995

## CAUSE OF ACTION NO 3 – Tortious Interference

22.     Stalwart Capital had a valid business expectancy with Old iCap Fund. New iCap Fund had knowledge of that expectancy.  New iCap Fund intentionally interfered with that expectancy.  New iCap Fund had an improper purpose for interfering, namely the circumvention of the Placement Agreement and avoiding payment to Stalwart Capital.   The interference by New iCap Fund caused damages to Stalwart by depriving it of the amounts owed under the Placement Agreement.   New iCap Fund is therefore liable to Stalwart Capital for tortuous interference in an amount to be proved at trial.

## RESERVATION

23.     Stalwart reserves the right to amend to add individual Christensen brothers as defendants if the facts learned in discovery support claims against any or all of them under *Olympic Fish Products v. Lloyd*, 93 Wn.2d 596, 611 P.2d 737 (1980); *Grayson v. Nordic Construction*, 92 Wn.2d 548, 554, 599 P.2d 1271, 1274 (1979) *Dep't of Ecology v. Lundgren*, 94 Wn. App. 236, 243, 971 P.2d 948 (1999) and similar cases holding individuals liable for wrongful conduct, including bad faith transactions designed to avoid a debt, or interference with their company's contract.

## PRAYER FOR RELIEF

WHEREFORE, having fully pled, plaintiff prays for the following relief:

1. For a judgment against defendants for the amounts owed under the Placement Agreement in an amount to be proved on summary judgment or at trial;

2. For an accounting of the amounts raised and the profits earned by defendants so as to determine the amount owed under the Placement Agreement;

3. For attorney's fees and costs;

4. For pre and post judgment interest; and

COMPLAINT - 8

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1900        TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

53469\01000\00766002.DOC.V1 MTA

5.  For such other and further relief as the Court deems just and proper.

DATED:  July 24, 2014

JAMESON BABBITT STITES
& LOMBARD P.L.L.C.

*/s/ Matt Adamson*

By:_____
Matt Adamson WSBA #31731
801 Second Ave. #1000 Seattle, WA 98104
T: 206.292.1994 F: 206.292.1995
madamson@jbsl.com
Attorneys for Plaintiff

COMPLAINT - 9

Jameson Babbitt Stites & Lombard, P.L.L.C.
Attorneys at Law
801 Second Avenue
Suite 1900          Tel 206 292 1994
Seattle, WA 98104-4001  Fax 206 292 1995

EXHIBIT A

## BEST EFFORTS PLACEMENT AGENT AGREEMENT

**THIS BEST EFFORTS PLACEMENT AGENT AGREEMENT** (the "Agreement") is entered into as of the 18th day of January, 2013, by and between iCapEquity Real Estate Fund I, LLC, a Washington limited liability company (the "Company") and Stalwart Capital, LLC, a New Jersey limited liability company (the "Agent").

### Recitals

WHEREAS, the Company needs assistance in raising capital for the real estate investment fund it owns, manages, or operates through itself, affiliates, or subsidiaries and it desires and requires the services of a managing broker/dealer to (i) provide consulting services including recommendations about the preparation and structuring of its security offering (the "Offering"), (ii) recommend and introduce the Company to third parties, including securities industry groups, due diligence analysts, broker/dealers, and others whom the managing Broker/Dealer thinks would be helpful to the Company in its efforts to raise capital (collectively a "Funding Source"), and (iii) serve as the managing broker/dealer, which includes preparing and maintaining all records required to be prepared or customarily prepared by managing broker/dealers after the marketing of the Offering begins, e.g., PPM delivery records, processing of subscription documents and subscription funds, and so on; and

WHEREAS, Agent is a broker/dealer in the business of consulting, assisting companies, serving as managing broker/dealer, and other roles in the business of locating Funding Sources; and

WHEREAS, the Company wishes to utilize the services of Agent to assist it in locating Funding Sources and other identified roles upon the terms and conditions set forth below.

### Agreement

**NOW, THEREFORE,** in consideration of the foregoing, the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Role of Agent.**

(a)      The Company retains Agent to use its best efforts to locate and introduce to the Company Funding Sources, based upon criteria provided to Agent by the Company, that are willing to raise capital or provide financing or other funding to the Company under the Offering. Additionally, Agent as managing broker/dealer, shall be authorized to engage other licensed broker-dealers (each a "Selling Group Member") to help promote the Offering and obtain Funding Sources, under the securities laws and rules of the United States and various state governments.

1

(b)     Additionally, Agent shall provide consultation about the structure of the Offering, advise on best strategies for obtaining funding and positioning the Company to attract such funding, advise the Company's management about the proper conduct of such an offering under Regulation D of the securities laws, recommend and sponsor the Company at various broker/dealer conferences to meet potential Selling Group broker/dealers, help the Company build the Selling Group, maintain proper records and systems as the managing broker/dealer/placement agent, counter-sign escrow account documents as needed and approved by the Company or required by securities laws or rules, and perform any other roles customarily performed by a managing broker/dealer/placement agent.

(c)     Agent does not undertake the responsibility to prepare Offering documents for the private placement, as the Company has assured it that it already has satisfactory Offering documents prepared. If these documents need changes in Agent's reasonable business judgment, and the Company refuses to make the changes, Agent retains the right to terminate this Agreement in accordance with Section 9 below. If Agent recommends changes to the Offering documents, then the Company shall incorporate such changes in the Company's sole discretion, and at its own cost and labor.

2. **Information Provided to Agent.**

(a)     In connection with Agent's activities hereunder, the Company will furnish Agent with all material and information regarding the business and financial condition of the Company (the "Information"). The Company represents and warrants that all Information, including but not limited to the Company's financial statements, will be complete and correct in all material respects and will not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements therein not misleading.

(b)     The Company recognizes and confirms that Agent: (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated herein without having independently verified same; (ii) is authorized as the Company's managing broker/dealer to transmit to any prospective investor a copy or copies, forms of purchase agreements and any other legal documentation supplied to Agent for transmission to any prospective investor by or on behalf of the Company or by any of the Company's officers, representatives or agents, in connection with the performance of Agent's services hereunder or any transaction contemplated hereby; (iii) does not assume responsibility for the accuracy or completeness of the Information and such other information; (iv) will not make an appraisal of any assets of the Company; and (v) retains the right to continue to perform due diligence during the course of the engagement.

(c)     The Agent agrees to keep the Information confidential and will not make use thereof, except in connection with the services hereunder for the Company, unless; (i) disclosure is required by law or requested by any government, regulatory or

2

DC E



self-regulatory agency or body in which event Agent will provide the Company with reasonable advance notice of such planned disclosure; (ii) any Information is or becomes generally available to the public; (iii) any Information was or becomes available to Agent on a non-confidential basis from a source other than the Company or any of its representatives; or (iv) Agent requires the same level of confidentiality of the recipients of such information and such information was delivered in the normal course of the fulfillment of Agents duties hereunder.

3. **Compensation to Agent.** Agent shall be entitled to receive and the Company shall pay Agent as follows:

(a)    A non-refundable, good-faith/due diligence deposit payable as follows: $7,500 paid at the time of mutual execution of this Agreement; and $2,500 on or before March 15, 2013 upon satisfactory completion of the advisory services contemplated hereunder. These funds will be used for Agent's due diligence expenses, for its management's travel expenses, and time associated with executing its due diligence responsibilities under the securities laws, and to ensure that Agent's work in preparation of the Offering materials isn't wasted, if the Company chooses not to proceed after its work has begun.

Each of the above installments to be wired to the Agent's bank account when due, as follows:

Bank of America
Routing Number  021200339
Account Number  381017031817
Hillsdale, NJ  07642
FBO Stalwart Capital, LLC

(b)    If Agent locates Funding Sources and the Company and the Funding Sources close the transaction(s), then Agent shall receive a ten percent (10%) fee on all capital raised from the proceeds of each and every Closing. Seven of these points will be the commission to be paid to any Selling Group Member responsible for the sale of the Company's securities; one percent (1%) will be for the due diligence fee that is re-allowable to the Selling Group Member responsible for the sale; and two percent (2%) will be retained by Agent for its services as the Managing Broker/Dealer/Placement Agent. In the event the Company, its management, affiliates, or representatives establishes any subsequent fund (whether now existing or yet to be created), and a Funding Source introduced to the Company by Agent subsequently invests in such fund, Agent shall be entitled to receive a 2% trailer fee at the time of investment; provided, however, that if the entity comprising such subsequent fund enters into a separate agreement with Agent for its services relative to such fund, then the provisions of such agreement shall control, and this trailer fee provision shall become null and void. Payments made under this Section 3(b) shall be made as of the date on which the funds are deposited into the Company's bank account.

3



OCE

(c) Agent shall also receive ten percent (10%) of all distributions of net income and capital gains (excluding tax distributions) available for distribution by the Company, as permitted under the Company's LLC Agreement, subject to the following sentence (the "Profit Interest"). The Profit Interest shall be pro rated according to the amount of funds raised by the Selling Group as compared to the total funds under management and shall be paid by the Company's management entity out of and the same as its Carried Interest. For example, if after paying the operating expenses of the Company there is $1.00 of Profit Interest available for distribution, and the Selling Group has raised 90% of the funds under management, then Agent shall receive nine cents ($0.09) (i.e. 90% of the ten cents ($0.10)) available for distribution. Agent may subsequently re-allow such payments fully or partially to other Selling Group Members as a means to encourage them to join the Selling Group and market the Company's securities. Agent shall disclose to the Company the portion of the Profit Interest that has been offered and/or re-allowed to any Selling Group Member within 3-days of any request by the Company for such information.

(d) Agent shall advise on items related to the Offering documents, but the Company shall cover any additional legal cost of all changes to be made to such documents. Company hereby acknowledges that significant advice relating to this matter has already been provided by Agent, and the parties agree that Agent's agreed upon compensation for its services hereunder is adequate and sufficient for all services thus provided or to be provided.

(e) In the event the Company, its management, affiliates, or representatives locates and secures a Funding Source that is not a Selling Group Member or a business contact introduced to the Company by Agent, and the Company and Funding Source close the transaction, then Agent shall receive a 1% processing fee as compensation for managing the compliance, paperwork, and risk associated with such Funding Sources.

4. **Non-Circumvention.** The Company may not circumvent Agent with respect to any fee agreed to hereunder. If Agent introduces the Company to any other Funding Source, directly or indirectly, by any means, and the Company obtains any capital by or through such other party, then Agent will be entitled to all compensation as detailed under Section 3 (b) and (c) above. By way of illustration, but without limiting the means of introduction that would entitle Agent to said compensation, if Agent recommends a broker/dealer conference, and the Company attends and meets or becomes aware of another broker/dealer that is a member of the group there that provides capital to the Company, then Agent will be entitled to the prompt payment of the compensation as detailed in Section 3(b) and 3(c) above.

5. **Independent Contractor.** Agent is not an employee of the Company for any purpose whatsoever but, rather, is an independent contractor/consultant. Agent does not have, nor shall Agent hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of, or obligating, the Company, or pledge the Company's credit, or extend credit in the

4





Company's name, unless the Company shall consent thereto in advance and in writing.

6. **Authority and Licensing.** Agent represents and warrants that it is a currently licensed broker/dealer and that it has, and shall maintain, all licenses necessary to perform its duties under this Agreement. Agent further agrees to maintain proper compliance with all government and regulatory agencies that issue or may issue such licenses and to require any Selling Group Member, or other party engaged by Agent, to do the same.

7. **Indemnities.**

(a)      The Company agrees to indemnify and hold Agent and its employees, agents and affiliates harmless from and against any and all loss, claim, damage, liability and expense (including, without limitation, costs of investigation, legal and other fees and expenses incurred in connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted), to which Agent may become subject under the United States or foreign securities laws, any applicable statute or regulation of any jurisdiction, at common law (whether tort, contract or any other basis), or upon, in whole or in part: (i) a material breach of this Agreement by the Company or (ii) an untrue statement of a material fact or omission to state a material fact, or allegation of an untrue statement of a material fact or omission to state a material fact, by the Company in any documents or information provided in connection with the placement of securities issued by the Company to investors, which was necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to the extent such breach, untrue statement or omission is the cause of the loss, claim, damage, liability or expense, or (iii) an untrue statement of a material fact or omission to state a material fact by the Company to any Funding Source introduced by Agent to the Company; or (iv) the Company's breach of its agreement with the Funding Source, (v) the Company or its employees and agents willful misconduct or gross negligence.

(b)      Agent agrees to indemnify and hold Company and its the respective officers, directors, shareholders, employees, agents, affiliates, attorneys and controlling persons harmless from and against any and all loss, claim, damage, liability and expense to which such persons may become subject insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any action or omission related to (1) a breach by Agent of any of the provisions hereof, (2) the untruth of any representation of Agent contained herein, (3) the failure by Agent to obtain or maintain proper licenses needed to perform all services of Agent under this Agreement, (4) the violation by the Agent of any law or regulation, the impact of which affects the Company in any way, (5) an investigation of the Company by any government agency or regulatory resulting from the errors or omissions of Agent, (6) any other cost to the Company not part of the ordinary course of its business which is the result of the errors or omissions of Agent, or (7) the willful misconduct or gross negligence of Agent, its employees and agents, and Agent further agrees to reimburse any legal or other expenses reasonably incurred by Company or any such person named above in connection with investigating or defending any such loss, claim, damage, liability or action

5

    (c)    Promptly after receipt by an indemnified party under this Section of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section, notify the indemnifying party of the commencement thereof; but the omission so to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party otherwise under this Section. In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party will not be liable to such indemnified party under this Section for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation.

    (d)    If recovery is not available under the foregoing indemnification provisions of this Section, for any reason other than as specified therein, the parties entitled to indemnification by the terms thereof shall be entitled to contribution for liabilities and expenses. In determining the amount of contribution to which the respective parties are entitled, there shall be considered the relative benefits received by each party from the transactions giving rise to liability, the parties' relative knowledge and access to information concerning the matter with respect to which the claim was asserted, the opportunity to correct and prevent any statement or omission, and any other equitable considerations appropriate under the circumstances.

    8. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No other person shall acquire or have any right under or by virtue of this Agreement. Agent shall not have any right to assign any of its rights hereunder without the prior written consent of the Company.

    9. **Term of Agreement**. Unless otherwise terminated, the term of this Agreement shall be for twelve (12) months unless extended by written agreement of the parties. This Agreement, however, may be terminated by Agent or the Company at any time upon thirty (30) days prior written notice to the other party. All provisions herein, including the non-circumvention clause in Section 4, shall survive such termination.

    10. **Applicable Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, without regard to its choice of law provisions or references to any other state laws.

    11. **Consultation with Counsel**. The Parties to this Agreement acknowledge, represent, and warrant that they entered into this Agreement only after due consideration, having ample opportunity to engage legal counsel should they choose, that they were not fraudulently induced, coerced, or intimidated to enter into it, and that in entering into it

6



they have not relied upon any oral or written statements or acts made by any other party other than as expressly set forth herein.

12. **Capacity to Enter into Agreement**. Each Party to this Agreement represents and warrants to the other Party that the execution of this Agreement has been duly authorized, executed and delivered by it and that all required corporate resolutions and authorizations have been approved or obtained.

13. **Entire Understanding**. This Agreement contains the entire understanding between the Company and the Agent with respect to the subject matter herein and supersedes any prior understanding and agreements between the parties, whether oral or written.

14. **Miscellaneous**. This Agreement may not be modified or amended except in writing duly executed by the parties hereto. The section headings in this Agreement have been inserted as a matter of convenience of reference and are not part of this Agreement. In the event of a dispute arising out of this Agreement, the prevailing party in such action shall be entitled to payment of all costs incurred as a result of any such action, including attorney's fees, by the non-prevailing party. Notwithstanding anything contained herein to the contrary, neither Agent nor the Company shall assign to an unaffiliated third party any of its obligations hereunder. For the convenience of the parties, this Agreement may be executed in any number of counterparts, each of which shall be, and shall be deemed to be an original instrument, but all of which taken together shall constitute one and the same Agreement. Facsimile signatures shall also be as effective as manual ones.

**IN WITNESS WHEREOF**, this Agreement has been executed by the undersigned as of the day and year first above written.

AGENT:
STALWART CAPTIAL, LLC

By: Douglas C. Evans
Its: Managing Principal

COMPANY:
ICAPEQUITY REAL ESTATE
FUND I, LLC

By: iCap Management, LLC
Its: Manager
    By: Chris Christensen
    Its: President

7