UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STALWART CAPITAL LLC,

        Plaintiff,

    v.

ICAP PACIFIC NORTHWEST
OPPORTUNITY AND INCOME
FUND, LLC, et al.,

        Defendants.

C14-1128-TSZ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

THIS MATTER came on regularly for a trial on November 16, 2015, and concluded on November 20, 2015. Matt Adamson of Jameson Babbitt Stites & Lombard, P.L.L.C. appeared as counsel for plaintiff and James Williams and Ulrike Connelly of Perkins Coie LLP appeared as counsel for defendants.

These Findings will adopt the following terms: iCapEquity Real Estate Fund I, LLC ("iCap Real Estate Fund I"); iCap Pacific Northwest Real Estate Fund, LLC ("iCap Real Estate Fund II"); iCap Pacific Northwest Income Fund, LLC ("iCap Income Fund I"); iCap Pacific Northwest Opportunity and Income Fund, LLC ('iCap Income Fund II"); and Stalwart Capital, LLC ("Stalwart" or "plaintiff").

On November 20, 2015, the jury reached a verdict, docket no. 110, and found in favor of defendant iCap Real Estate Fund II on plaintiff's first claim for breach of contract; in favor of defendant iCap Income Fund II on plaintiff's fourth claim alleging interference with a business expectancy; in favor of defendant Chris Christensen on plaintiff's fifth claim alleging interference with a business expectancy; and in favor of plaintiff on defendant iCap Real Estate Fund I's counterclaim against Stalwart for breach of contract.

At trial, the Court was also presented with certain equitable claims.  Although the equitable claims were presented to the jury, the verdict was advisory in nature as to these claims.  The Court, having heard the testimony, having reviewed the evidence and having heard the arguments of counsel, now makes the following Findings of Fact and Conclusions of Law on the following equitable claims contained in plaintiff's First Amended Complaint, docket no. 47:

1. A claim for breach of contract as a result of successor liability against iCap Income Fund II; and

2. A claim for breach of contract against Chris Christensen based on (a) the responsible corporate officer doctrine based on a fraudulent transfer, and (b) improper use of the corporate form.

### I.   FINDINGS OF FACT

**A.   Stipulated Facts**

The parties stipulated to the following findings of fact (docket no. 97):

1. Stalwart is a New Jersey limited liability company.

2. Stalwart is a broker dealer licensed under the laws of New Jersey.

3. Stalwart is owned by Douglas Evans, a resident of New Jersey.

4. Chris Christensen is a resident of Washington.

5. iCap Income Fund II was incorporated with the State of Delaware on November 12, 2013.  It is an active Delaware limited liability company.  On November 19, 2013, iCap Income Fund II was registered in Washington State.

6. iCap Pacific NW Management LLC is an active Washington limited liability company formed in the State of Washington on June 26, 2013.

7. iCap Pacific NW Management LLC serves as the sole manager of iCap Income Fund II.

8. iCapEquity, LLC is a Washington limited liability company and it was incorporated on August 5, 2011.

9. Altius Development Inc. is a Washington corporation.

10. On January 18, 2013, Stalwart and iCap Real Estate Fund I entered into the Best Efforts Placement Agent Agreement (the "Placement Agreement"), Ex. 8.

**B.     The Court's Findings of Fact**

1. In late December 2012, Chris Christensen and his brothers sought to hire a broker-dealer to help them raise capital.  They had no experience in hiring brokers or operating private placement funds.  They called various broker-dealers.

2. On January 18, 2013, Stalwart and iCap Real Estate Fund I entered into the Placement Agreement. Ex. 8.  Douglas Evans signed on behalf of the plaintiff, as managing principal and Chris Christensen signed on behalf of iCap Real Estate Fund I, as

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

its President.  It is undisputed that this is the only written contract entered into between the parties.

3. Exhibit 8 provides in part, that Stalwart will "(ii) recommend and introduce the Company to third parties, including securities industry groups, due diligence analysts, broker/dealers, and others whom the managing Broker/Dealer thinks would be helpful to the Company in its efforts to raise Capital (collectively a 'Funding Source')".

4. Under the Placement Agreement, Stalwart would receive ten percent of the amount raised by "Funding Sources" introduced by Stalwart, plus 10 percent of the net profits.

5. Section 4 of the Placement Agreement prohibited iCap Real Estate Fund I from circumventing Stalwart.  Section 4 provides:

> 4. Non-Circumvention.  The Company may not circumvent Agent with respect to any fee agreed to hereunder.  If Agent introduces the Company to any other Funding Source, directly or indirectly, by any means, and the Company obtains any capital by or through such other party, then Agent will be entitled to all compensation as detailed under Section 3 (b) and (c) above.  By way of illustration, but without limiting the means of introduction that would entitle Agent to said compensation, if Agent recommends a broker/dealer conference, and the Company attends and meets or becomes aware of another broker/dealer that is a member of the group there that provides capital to the Company, then Agent will be entitled to the prompt payment of the compensation as detailed in Section 3(b) and 3(c) above.

6. Stalwart recommended that Chris Christensen make a presentation of the fund to broker-dealers at The National Due Diligence Alliance ("TNDDA") conference in Dallas, Texas, in March 2013.

7. Shortly before the TNDDA conference, Christensen and Stalwart agreed that a new entity would be formed to pursue the real estate investment fund with Stalwart as managing broker dealer.  Mr. Christensen then filed papers with the Washington Secretary of State to form iCap Real Estate Fund II.  The fund documents, including the Private Placement Memorandum ("PPM") and a "pitch deck" were revised to name the new entity, and continued to name Stalwart Capital as the managing broker dealer.  The PPM was also revised to state that iCap Real Estate Fund II agreed to be bound by the Placement Agreement.  *See* Ex. 25.

8. At the TNDDA conference in March 2013, Chris Christensen presented his real estate investment fund as being run by iCap Real Estate Fund II, with Stalwart listed as managing broker-dealer, and set forth the fees to be paid to Stalwart under the Placement Agreement.  *See* Ex. 24.

9. While at the TNDDA conference, Chris Christensen met Roger Overby, who was working for IAA at the time.

10. On May 15, 2013, iCap Real Estate I terminated Stalwart.  At the time, no explanation was provided.  During trial, Mr. Christensen testified that Stalwart's owner, Doug Evans, lacked sufficient experience, did not present well, had a temper, and that they did not want someone like that being their representative.

11. In the Spring of 2013, Christensen decided to use Overby to obtain funding. Mr. Christensen formed a new LLC to contract with Overby's company IAA. Christensen decided on the name "iCap Income Fund I."  He asked Mr. Overby if it was okay if they did not use the words "real estate" in the name.  Overby responded "yes if

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5

you think it helps legal position." Ex. 67.  Mr. Overby admits that his comment was a reference to avoiding liability to Stalwart.  Mr. Christensen then responded by email that "I think the word 'income' gives us the distance we need for legal purposes." *Id.*  At all times material iCap Income Fund I never had any books or records or a bank account and only existed on paper.  At all times material it was owned by iCap Pacific Northwest Management, LLC, which was wholly-owned by Chris Christensen.

12. iCap Income Fund I then entered into the contract with IAA for IAA to serve as exclusive managing broker-dealer for Mr. Christensen's efforts to raise capital.

13. Mr. Christensen continued to pursue a private placement offering through the broker-dealer channel, now under the name iCap Income Fund I.  To pursue that business model and capital, iCap Income Fund I took over and continued to use some of the intangible assets the business had been using when working with Stalwart.

14. After April 2013, Mr. Christensen and Mr. Overby and others from IAA traveled throughout the country to promote iCap Income Fund I to potential investors.  iCap Income Fund I agreed to reimburse IAA for these expenses.  Mr. Christensen used other entities he owned to pay those expenses.

15. In the fall of 2013, Mr. Overby moved from IAA to another broker-dealer called Skyway.  Skyway and Mr. Christensen continued to work toward raising capital.

16. By early November 2013, the PPM was essentially finalized, a due diligence report was done, and the fund was very close to launching.

17.     In mid-November 2013, Mr. Christensen formed iCap Income Fund II to launch the fund.  iCap Income Fund II entered into a contract with Mr. Overby's company (now Skyway) to serve as exclusive managing broker-dealer.

18.     A substantial amount of the work done promoting the investment fund, between March 2013 and early 2014, benefitted iCap Income Fund II even though it was not formed until November 2013.  The expenses for this work were paid by other Christensen-owned entities, iCap Equity, LLC and Altius Development, LLC, who were later reimbursed by iCap Income Fund II.

19.     Mr. Christensen admitted that iCap Income Fund II was just a "name change" from iCap Income Fund I, and that the corporate distinctions between his various entities "did not exist in practical reality."

20.     Mr. Overby helped Mr. Christensen's fund – now under the name iCap Income Fund II – raise $46,204,544.  Defendants refused to pay Stalwart a fee pursuant to Section 4 of the Placement Agreement.

21.     At all times material, Christensen knew of the potential liability to Stalwart.  He testified that he acted, in part, to avoid a liability to Stalwart.  He transferred some intangible assets necessary to pursue his investment fund and his business to new entities and formed those entities at least in part for the purpose of evading a liability to Stalwart.

22.     The Court finds that Stalwart substantially performed under the Placement Agreement.  The Court finds that iCap Real Estate Fund II assumed and agreed to be bound by the Placement Agreement.  However, the jury found that iCap Real Estate Fund

II did not breach the Placement Agreement.  Thus, iCap Real Estate Fund II is not liable to plaintiff for breach of contract.

23. iCap Income Fund II did not assume or agree to be bound to the Placement Agreement.  In addition, the Court finds that the sale of debentures by iCap Income Fund II was a substantially different investment vehicle than the equity type of investment originally proposed by plaintiff.

## II.   CONCLUSIONS OF LAW

1. The general rule in Washington is that only parties that agree to be bound by a contract have an obligation to perform under it.  Individual corporate entities are generally treated as separate from other entities, regardless of common ownership.  Under Washington law, when a corporation sells or transfers its assets to another corporation, the successor corporation does not normally become liable for the debts of the first corporation.  However, the successor liability doctrine provides three relevant exceptions to this general rule, and successor liability may be imposed if:  (1) the successor entity implicitly agrees to assume liability; (2) the successor entity is a mere continuation of the seller; or (3) there is a bad faith transfer of assets for the fraudulent purpose of escaping liability.

2. Successor liability is an equitable doctrine to be decided by the Court.  *Uni-Com N.W. v. Argus Pub. Co.*, 47 Wn. App. 787, 805 (1987).  The successor liability doctrine is an equitable *remedy* and not a freestanding basis for relief.  The doctrine is predicated on imputing an existing liability to another person or entity that, under equity, should be held liable.  Plaintiff has argued that successor liability can operate to *create*

the liability, rather than merely transfer it, but the Court concludes that there is no support under Washington law for this position. Washington cases addressing successor liability involve an established liability, not rewriting contractual terms to substitute a party. *See, e.g.*, *Hall v. Armstrong Cork, Inc.*, 103 Wn.2d 258, 261 (1984) ("[A] corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for *the debts and liabilities* of the selling corporation….") (emphasis added). Plaintiff has not offered, and the Court is unable to discover, any Washington case that utilizes the doctrine of successor liability in the manner plaintiff suggests.

3. Plaintiff also brings a claim for breach of contract against Chris Christensen individually alleging that he is a corporate officer of the LLC responsible for wrongful conduct or that he used an LLC form to violate or evade a duty and he should therefore be liable on this claim. The general rule in Washington is that a corporate officer is not liable for an LLC's breach of contract. The law, however, allows a plaintiff to recover against an officer of an LLC for breach of contract under the responsible corporate officer and corporate disregard doctrines. However, these doctrines serve only to make an individual liable for the liability or wrongdoing of another entity. *See Grayson*, 92 Wn.2d at 553-54; *Meisel v. M&N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 409-10 (1982). Thus, the establishment of a liability is a *sine qua non* to even considering these equitable claims.

4. In the context of this case, iCap Income Fund II could only be held liable for breach of contract under the doctrine of successor liability if the jury found that iCap Real Estate Fund II breached the Placement Agreement or that iCap Income Fund II

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

tortiously interfered with the business expectancy of plaintiff.  Similarly, Chris Christensen could only be liable for breach of contract under the doctrine of corporate disregard or responsible corporate actor if the jury found that iCap Real Estate Fund II breached the Placement Agreement.  Because the jury verdict was in favor of the defendants on the legal claims of breach of contract and tortious interference, there is no liability which can trigger successor liability against iCap Income Fund II or personal liability against Chris Christensen as a matter of law.

5. At trial the Court ruled as a matter of law that defendant iCap Real Estate Fund I was not entitled to recover on its counterclaim for unjust enrichment.

6. Plaintiff's equitable claims are DISMISSED with prejudice.

Dated this 22nd day of January, 2016.

　　　　　　　　　　　　　　　　　　／s／ Thomas S. Zilly
　　　　　　　　　　　　　　　　　　Thomas S. Zilly
　　　　　　　　　　　　　　　　　　United States District Judge